## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| Kim Carlson Lewis, as Personal Representative of Erik Carlson, deceased, and on her own behalf; | |
| Lindsey Gratehouse, on behalf of her minor child M.G. | |
| Plaintiffs, | |
| v. | |
| Harris County, Texas; | |
| Ed Gonzalez, in his individual and in his official capacities; | |
| LaSalle Correctional Center, L.L.C.; | Case No. |
| LaSalle Corrections, L.L.C.' | |
| LaSalle Management Company, L.L.C.; | JURY TRIAL DEMANDED |
| Clay McConnell, in his individual and in his official capacities; | |
| William McConnell, in his individual and in his official capacities; | |
| John Stuckey, in his individual and in his official capacities; | |
| Paul Smith, in his individual and in his official capacities; | |
| Pamela Hearn, in her individual and in her official capacities; | |
| Gwen Warren, in her individual and in her official capacities: | |
| Charlotte Fussell, in her individual and in her official capacities: | |

Tara Lindsey, in her individual and in her official capacities:

Doe Nurses #1-5, in their individual capacities;

and

Doe Correctional Officers #1-5, in their individual capacities.

   Defendants.

## COMPLAINT

For their Complaint, Plaintiffs Kim Carlson Lewis, as personal representative of Erik Carlson, deceased, and Lindsey Gratehouse, by and through their attorneys, J. Chris Guillet - Attorney at Law, LLC, and Romanucci & Blandin, LLC, state as follows:

## INTRODUCTION

Within eight days of arriving at LaSalle Correctional Center in Olla, Louisiana, 29-year-old Erik Carlson died after medical and correctional staff denied him treatment and ignored his strep throat infection, which quickly turned life-threatening. His illness was not sudden nor unpreventable. In fact, upon arrival at the LaSalle facility, Mr. Carlson reported to his grandmother that he was beginning to feel ill, and his bunkmates quickly noticed that something was wrong. These bunkmates notified staff of his illness repeatedly, but were told by nurses that over-the-counter medicine available for purchase at commissary was Mr. Carlson's only option. However, it quickly became evident that Mr. Carlson's illness required medical treatment beyond cough drops and Advil. His throat began to swell, he was

coughing up blood and mucus, and he developed a fever. Concerned inmates repeatedly told correctional and medical staff that Mr. Carlson desperately needed to be seen. In the days leading up to his death, Mr. Carlson's throat had swollen so severely that he struggled to speak, eat, and breathe. There was an abscess in his neck the size of a golf ball, and he was spitting up blood. His family had not heard from him in several days and called requesting a welfare check. Their concerns were dismissed by staff who told them that Mr. Carlson was fine. The day after that welfare check, Mr. Carlson was so ill that he required emergency transport to several outside facilities. However, these efforts came too late, and Mr. Carlson succumbed to his illness in the early hours of January 25, 2025.

At the time of his death, Mr. Carlson was a resident of Houston, Texas. He was being held nearly 300 miles from home in Olla, Louisiana, because Harris County, Texas, outsources the jailing of many detainees to a private prison company called LaSalle Corrections. By sending inmates to private facilities out of state, Harris County avoids oversight by the Texas Commission on Jail Standards, which regulates jails in the state to ensure that residents receive humane treatment, including adequate medical care. Harris County knew that facilities run by LaSalle, including the Olla facility, kept residents in conditions that fell far below state standards, and have a documented history of failing to provide adequate medical care to detainees. Despite this notice, Harris County continues to ship out people in its custody to LaSalle facilities and to other private prison companies with similar track records.

Mr. Carlson's family brings this lawsuit to hold accountable the medical and jail administrators at the LaSalle facility who ignored Mr. Carlson's needs and refused to get him treatment. Plaintiffs also sue LaSalle Corrections, and its owners, for their indifference to the medical needs of people like Mr. Carlson. Harris County and Harris County Sheriff Ed Gonzalez are also sued for outsourcing the County's non-delegable duty to ensure that Mr. Carlson and other Harris County detainees are housed in humane conditions while in their custody. Mr. Carlson's death was entirely preventable, and he leaves behind a grieving mother, grandmother, fiancé, and daughter. In bringing this lawsuit, his family seeks redress for that harm and seeks to end the treatment by defendants and other jailors that Mr. Carlson was subjected to.

## JURISDICTION

1.      This is a civil rights action arising under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution. The Court has Jurisdiction pursuant to 28 U.S.C. §§1331 & 1343.

2.      The Court additionally has subject matter jurisdiction over Plaintiffs' state law claims under 42 U.S.C. § 1367 as those claims arise from the same transaction and occurrence as Plaintiffs' federal claims.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because one or more of the Defendants reside in this judicial district and a substantial part of the events or omissions giving rise to the claims asserted in this lawsuit occurred in this judicial district.

## PARTIES

### A.  The plaintiffs.

4.      Kim Carlson Lewis is the mother of the decedent, Erik Carlson. She is the Personal Representative of Erik Carlson, deceased. In her representative capacity, she brings this action on behalf of all beneficiaries.

5.      Kim Carlson Lewis also brings this action in her personal capacity on her own behalf as Mr. Carlson's mother, to recover damages sounding in wrongful death.

6.      Lindsey Gratehouse is the mother of Mr. Carlson's minor daughter, M.G. Ms. Gratehouse brings this action on the child's behalf to recover damages sounding in wrongful death.

### B.  The municipal defendants.

7.      Defendant Harris County is a governmental entity and a political subdivision of the state of Texas.

8.      Ed Gonzalez is the Sheriff of Harris County, Texas. He is sued in his official and individual capacities. In his official capacity, Sheriff Gonzalez is included in all references to "Harris County."

9.      Harris County and Sheriff Gonzalez have outsourced the confinement of numerous people in their custody who are awaiting trial to private jailors, including Defendant LaSalle.

10.      Harris County and Sheriff Gonzalez have a non-delegable duty to ensure that all people the custody of Harris County, including people whose

detention it outsources to private jailors like LaSalle, receive adequate medical care and humane conditions of confinement as mandated by the U.S. Constitution and Texas law.

### C. The corporate defendants.

11.    Defendant LaSalle Correctional Center, L.L.C. is a private entity. On information and belief LaSalle Correctional Center, L.L.C. owns and operates the La Salle Correctional Center in Olla, Louisiana ("Olla LCC"), where Mr. Carlson was detained when he died.

12.    LaSalle Corrections, L.L.C. is a private entity that, on information and belief, maintains, manages, and operates at least eighteen jails throughout the states of Louisiana, Texas, Mississippi, and Georgia, including the Olla LCC.

13.    LaSalle Management Company, L.L.C. is a private entity responsible for the operations and employees at various LaSalle facilities, including the Olla LCC.  Doing business as "LaSalle Corrections," this defendant is an operator of correctional centers throughout the States of Louisiana, Texas, New Mexico, Arizona, and Georgia.

14.    Collectively and individually, LaSalle Correctional Center, L.L.C., LaSalle Corrections, L.L.C., and LaSalle Management Company, L.L.C., d/b/a LaSalle Corrections are referred to in this complaint as "LaSalle".

15.    LaSalle has a duty to ensure that all the people in its custody receive adequate medical care.

**D. The individual defendants.**

16.    Defendant Clay McConnell and Defendant William McConnell are the owners of LaSalle and additional corporate entities affiliated with LaSalle. They are sued in their individual and in their official capacities.

17.    Defendant Clay McConnell and Defendant William McConnell exercise ultimate control over and policymaking authority regarding LaSalle's policies and practices as described herein.

18.    John Stuckey is the Warden of the Olla LCC. He is sued in his individual capacity and in his official capacity.

19.    Paul Smith was Assistant Warden of the Olla LCC. He is sued in his individual capacity and in his official capacity.

20.    Pamela Hearn, M.D. is the Medical Director for LaSalle and the medical director of the Olla LCC. She is sued in her individual capacity and in her official capacity.

21.    Charlotte Fussell was the Health Service Director of the Olla LCC. She is sued in her individual capacity and in her official capacity.

22.    Tara Lindsey is a Licensed Professional Nurse who was responsible for the medical care of detainees and/or inmates in the Olla LCC. She is sued in her individual capacity.

23.    Gwen Warren is a Licensed Professional Nurse who was responsible for the medical care of detainees and/or inmates in the Olla LCC. She is sued in her individual capacity.

24.    Defendant Nurse Does #1-5 are Licensed Professional Nurses who were responsible for medical care of detainees and/or inmates in Olla LLC. They are sued in their individual capacities.

25.    Defendant Officers #1-5 are correctional officers employed by LaSalle at Olla LLC. They are sued in their individual capacities.

26.    In the events described in this complaint, each defendant named acted within the scope of their employment and under color of law.

## FACTS COMMON TO ALL COUNTS

### A. Mr. Carlson's detention in Harris County and his transfer to LaSalle's Olla LLC.

27.    At the time of his death, Erik Carlson was a 29-year-old resident of Houston, Texas.

28.    On January 5, 2025, Mr. Carlson was arrested in Houston after officers found him asleep behind the wheel of his vehicle.

29.    Mr. Carlson was taken to the Harris County Jail in Houston, Texas, where he was detained awaiting adjudication of his charges.

30.    On January 15, 2025, Mr. Carlson called his mother, Kim Carlson Lewis, and told her he was recovering from a cold.

31.    At the time of Mr. Carlson's arrest, Harris County contracted with LaSalle to outsource and house Harris County inmates in LaSalle facilities while they await trial.

32.    Pursuant to this contract, on Friday, January 17, 2025, Mr. Carlson was transported nearly 300 miles from home and arrived at LaSalle Correctional Center in Olla, Louisiana.

33.    Shortly after arriving at Olla LCC, Mr. Carlson started to feel sick.

34.    He sought medical treatment but was told that he would need to get over-the-counter medication from commissary.

35.    Per LaSalle's sick call policy at the time, detainees could submit sick call requests Monday through Friday, but each sick call service or physician's visit cost $5. If an inmate required further evaluation or care, they had to wait until either Wednesday or Thursday, the two days a medical provider was onsite.

36.    On Sunday Mr. Carlson called his grandmother, Harlee Carlson, and told her that he was feeling ill and had a sore throat.

37.    Later that day, Harlee Carlson received two more phone calls identified as being from Mr. Carlson, but the line was silent and she was unable to speak with him.

38.    Mr. Carlson was extremely close with his grandmother and would call her regularly.

39.    By Monday, January 21, 2025, Mr. Carlson's illness had significantly worsened.

40.    He had a fever and spent most of the day in bed, only able to eat a small amount of soup.

41.     Unable to get medication from the nurses, one of Mr. Carlson's bunkmates melted some cough drops into a tea for him to help with his throat pain.

42.     Mr. Carlson filed a sick call request that evening.

43.     On Wednesday, January 22, 2025, Mr. Carlson's condition continued to deteriorate but he was still not seen by any medical staff.

44.     His throat was visibly swollen, he struggled to speak, and he began coughing up blood.

45.     He maintained a fever and slept for most of the day.

46.     On Thursday, January 23, 2025, his fever increased, the swelling in his neck worsened and he was unable to get out of bed or eat.

47.     His cellmate provided him with some chicken broth and Vicks VapoRub for his chest, as Mr. Carlson complained that he was struggling to breathe.

48.     During this time, other detainees who were bunked nearby informed medical staff of Mr. Carlson's condition and told them he needed to be seen by medical staff, but no action was taken.

49.     One of  these detainees, who received prescription medication from the medical staff every day, repeatedly told staff that Mr. Carlson was ill and needed to be seen.

50.     Medical staff told this man that the only option was to get something from commissary.

51.     Upon information and belief, Charlotte Fussell, Gwen Warren, Tara Lindsey, John Doe Nurses 1-5, and John Doe Correctional Officers 1-5 were among the medical and jail staff who reviewed Mr. Carlson's sick call and/or received the complaints from Mr. Carlson's cellmates.

52.     Upon information and belief, Charlotte Fussell, Gwen Warren, Tara Lindsey, John Doe Nurses 1-5, and John Doe Correctional Officers 1-5 were aware that Mr. Carlson was very ill and needed to receive medical care beyond the capabilities of LaSalle Corrections Center, but did not take any steps to facilitate his transfer to a hospital.

53.     Mr. Carlson's family became concerned as they had not heard from him in days.

54.     Harlee Carlson called the facility and requested a welfare check.

55.     The employee she spoke to did not ask for Erik's inmate number and told Harlee that Mr. Carlson was fine and in his dorm.

56.     On the morning of Friday, January 24th, 2025, Mr. Carlson was spitting up blood and his neck had swollen to the size of a golf ball.

57.     His cellmates got the attention of a Lieutenant officer and urged that Mr. Carlson needed immediate medical treatment.

58.     The Lieutenant informed the medical staff who instructed him to have Mr. Carlson fill out a sick call request to be taken to the clinic.

59.     Mr. Carlson was taken to the clinic and seen by a nurse.

60.    Mr. Carlson reported to the nurse that he had been ill for a little over a week, and his throat had been swelling for days.

61.    The nurse noted his inability to speak well and examined his throat.

62.    The nurse reported that there was extreme swelling on his tongue and the roof of his mouth to the extent that his tonsils, throat, and epiglottis were not visible.

63.    Additionally, there was yellow and green drainage, white pustules in his throat, and his neck glands were enlarged and tender to the touch.

64.    The nurse called for Mr. Carlson to be transported to the ER.

65.    At LaSalle General Hospital, it was noted that the condition of his neck made it difficult for him to breathe.

66.    As Mr. Carlson was being transported to another hospital to receive a higher level of care, he suffered cardiac arrest.  Efforts to rescuscitate him were unsuccessful and was declared dead shortly after midnight on January 25, 2025.

67.    Examination done after Mr. Carlson's death determined that he died as a result of a peritonsillar abscess due to a strep throat infection.

68.    Mr. Carlson suffered extreme emotional and physical pain leading up to his death.

**B.  LaSalle's policy of providing inadequate medical care.**

69.    The failure to provide Mr. Carlson with appropriate medical care was driven by the policies and practices of Defendant LaSalle, which permit and tacitly endorse such unlawful treatment.

70.     At all times relevant to the events at issue in this case, Defendant
LaSalle contracted with the multiple jailors, including Harris County, to house and
to provide healthcare to people housed in various LaSalle jails.

71.     Having taken custody of such detainees, LaSalle was responsible for
ensuring that they received adequate medical care.

72.     As the provider of healthcare services, LaSalle was responsible for the
creation, implementation, oversight, and supervision of policies, practices, and
procedures regarding the provision of medical care to people in its custody,
including people in custody at Olla LCC.

73.     Prior to the events giving rise to Plaintiff's Complaint, Defendants
LaSalle, Fussell, and Hearn had notice of widespread policies and practices by
healthcare and correctional staff at Olla LCC and throughout jails operated by
LaSalle pursuant to which people in custody like Mr. Carlson with serious medical
needs were routinely denied medical care and access to medical care.

74.     It is common within LaSalle facilities, including Olla LCC, to see the
medical treatment of detainees and prisoners with clear symptoms of serious
medical needs and whose medical records reflect an obvious need for treatment,
routinely delayed or completely ignored by healthcare and correctional employees.

75.     Despite knowledge of these unlawful policies and practices, Defendants
LaSalle, Hearn, and Fussell, did nothing to ensure that detainees and prisoners in
LaSalle jails received adequate medical care and access to medical care, thereby
acting with deliberate indifference.

76.    Specifically, there exist policies or widespread practices within LaSalle jails pursuant to which prisoners receive unconstitutionally inadequate healthcare, including policies and practices pursuant to which: (1) healthcare personnel commonly fail to respond or follow up on complaints by detainees and prisoners about their health status; (2) healthcare personnel fail to follow appropriate diagnostic procedures, favoring instead cheaper procedures even if they are demonstrably ineffective; (3) healthcare personnel fail to take action to secure appropriate continuity of care for complicated and urgent conditions; (4) guards are under-trained, and are not trained regarding their obligations with respect to medical care, and are instructed not to seek outside medical care so long as a detainee is alive and breathing, and are prohibited from calling 911 for medical emergencies without supervisory permission; and (5) healthcare and administrative personnel fail to refuse to arrange for detainees to be treated in outside facilities, even when an outside referral is necessary or proper.

77.    These widespread policies and practices were allowed to flourish because Defendant LaSalle, which directs the provision of healthcare services within its jails, has directly encouraged the very type of misconduct at issue in this case, failed to provide adequate training and supervision of healthcare and correctional employees, and failed to adequately punish and discipline prior instances of similar misconduct.

78.     In this way, Defendant LaSalle violated Mr. Carlson's rights by maintaining policies and practices that were the moving force driving the foregoing constitutional violations.

79.     The above-described practices, so well-settled as to constitute de facto policy within LaSalle jails, were able to exist and thrive because Defendant LaSalle was deliberately indifferent to the problem, thereby effectively ratifying it.

80.     Defendants John Stuckey and Pamela Hearn were aware of these policies and practices as well, as they were implemented and carried out at Olla LCC, but failed to take reasonable steps to stop them, effectively adopting a policy of indifference and tacit approval of said policies and practices.

81.     The unconstitutional acts that ultimately resulted in Mr. Carlson's death were done in accordance with the official policies and widespread practices of the corporate and municipal defendants.

82.     These policies and practices were the moving force behind the unconstitutional actions of the individual defendants and caused Mr. Carlson's death. These policies and practices are more fully explained herein.

83.     The following are examples of such policies in practice:

a.      Holly Barlow-Austin went blind after LaSalle employees at Bi-State Jail failed to give her necessary medication, which resulted in a $7,000,000 settlement with LaSalle. Her injuries were the subject of a highly publicized lawsuit.

b.    A prisoner's lawsuit alleging that he fell at Jackson Parish Correctional Center and did not receive appropriate medical care resulted in a public $405,000 settlement with LaSalle.

c.    Cecil Williams suffered an asthma attack at a LaSalle facility and was denied treatment and resuscitation efforts for over an hour after losing consciousness.

d.    In September 2013, Greg McElvy, an inmate at a LaSalle facility, began exhibiting symptoms that indicated life-threatening illness, including vomiting, not eating, not drinking, self-defecating, self-urinating, respiratory distress, and abnormal blood pressure. Over the course of three days, he, other inmates, and one guard reported to LaSalle medical staff that he was dying and implored that he receive immediate medical attention. He was not taken to a hospital or medical doctor, and was ultimately found unresponsive in a pool of vomit and died of acute bronchopneumonia and asthmatic complications.

e.    In May 2015, Ronald Beesley died in the same LaSalle facility as Mr. McElvy after reporting chest pain and swelling in his limbs to LaSalle staff. His wife visited him the day before his death and, after observing that he could barely walk or talk, contacted a LaSalle official to express that he was severely ill and needed medical attention. Mr. Beesley had a chest infection that could have

been diagnosed and treated with antibiotics by a medical doctor, but Mr. Beesley was never taken to the hospital, was not monitored by LaSalle staff, was not medically treated by LaSalle staff, and consequently died in the LaSalle facility.

f.    In July 2015, Michael Sabbie died after LaSalle staff failed to provide medication and treatment for his heart disease and diabetes. LaSalle staff knew that Mr. Sabbie had many chronic and serious medical conditions and placed him in a medical observation cell, yet they did not give him medication, monitor him, or refer him to the appropriate medical providers. Throughout his time at the LaSalle facility, staff falsified his medical and observation records, practiced outside the scope of their licenses, and accused him of faking his condition. The staff responsible for his safety and medical care did not receive proper training. His death was the subject of a well- publicized lawsuit and a 169-page report and recommendation, written by United States Magistrate Judge Caroline M. Craven, denying LaSalle's summary judgment motion and detailing the widespread unconstitutional deficiencies at one of LaSalle's Texas jails. *See Sabbie v. Southwestern Corr., LLC*, No. 5:17cv113-RWS-CMC, ECF 122, 2019 U.S. Dist. LEXIS 214463 (E.D.Tex., Mar. 6, 2019). LaSalle conducted no internal review of Mr. Sabbie's death, made no policy changes, and took no other steps

to correct the unconstitutional conditions, actions, and practices that led to his death.

g.    Because of LaSalle's failure to address these known issues, history repeated itself almost exactly a year later in July 2016 when Morgan Angerbauer died at only 20 years old in a LaSalle facility in Texas due to almost the exact same conditions that caused Mr. Sabbie's death. Ms. Angerbauer had chronic medical needs and was assigned to a medial observation cell, but she was not given her medication and not appropriately monitored. She was accused of faking her conditions and, even as she banged on her cell door for hours, was never referred to a hospital or medical doctor for an evidently life-threatening medical condition. As with Mr. Sabbie, the LaSalle facility was not appropriately staffed to address Ms. Aungerbauer's medical needs, and the staff that was there were not trained and/or acted consistently with the widespread unconstitutional practices within LaSalle's culture.

h.    In April 2018, LaSalle staff again failed to render adequate medical care to its detainees when one suffered a stroke and was not provided emergency services or taken to the hospital for approximately 24 hours.

i.    In July 2018, William Jones, a detainee at a LaSalle facility, was not provided medication, monitored, provided emergency medical

services, or taken to the hospital after being beaten and injured. LaSalle never transported him to the hospital. Instead, they released him to his sister who called an ambulance. By the time he got to the hospital, Mr. Jones was nearly dead and placed on a ventilator. He was hospitalized for nearly a month. His experience and injuries were the subject of a well-publicized lawsuit.

j.  In March 2019, Franklin Greathouse, a detainee in a LaSalle facility, reported having a seizure to LaSalle staff, who accused him of faking it and refused to refer him to a medical doctor or hospital. He died later the same day from a seizure. Even after state investigators and authorities found they were not in compliance with Texas jail standards, had failed to appropriately monitor Mr. Greathouse, and falsified observation logs, LaSalle made no changes to their conditions, policies, or practices.

k.  A diabetic woman died after a LaSalle nurse failed to give her medical treatment. Her death resulted in a public $200,000 settlement and the LaSalle nurse pleading guilty to negligent homicide.

l.  The U.S. Senate's Permanent Subcommittee on Investigations investigated a LaSalle facility in Irwin County, Georgia found that numerous female detainees housed there were subject to "excessive, invasive, and often unnecessary gynecological procedures,"

including hysterectomies. After Dawn Wooten, a nurse and former employee of LaSalle, reported unnecessary hysterectomies, LaSalle terminated her employment. She filed a whistleblower lawsuit. The investigation into the Irwin County facility revealed 659 reports from detainees who described "delayed or deficient medical care" and found that LaSalle failed to take appropriate corrective action in response to these deficiencies. The Irwin County facility's conditions were so far below minimum standards that Immigration and Customs Enforcement (ICE) was ordered to stop housing detainees there.

### C. LaSalle's provision of inadequate medical care is driven by the greed of its owners.

84.     LaSalle continues to implement the foregoing unconstitutional conditions, policies, and practices at their jails, despite their knowledge of the safety risk posed to inmates, primarily or entirely because it is profitable to do so.

85.     LaSalle routinely submits low bids to win contracts with municipalities for local jails.

86.     In order to profit from these below-market contracts, LaSalle aggressively cuts costs by hiring untrained, unlicensed correctional officers and low-level nurses, hiring fewer personnel than necessary to properly manage the jails, refusing to invest in training for their personnel, and discouraging employees from transporting inmates to clinics or hospitals, even when there is a life-threatening medical concern.

87.    Defendant Clay McConnell and Defendant William McConnell are aware of the foregoing policies and practices pursuant to which LaSalle provides inadequate medical care to detainees.

88.    Defendant Clay McConnell and Defendant William McConnell own and exercise ultimate control LaSalle's policies and practices.

89.    As such, Clay McConnell and Defendant William McConnell have a duty to ensure that LaSalle provides constitutionally adequate medical care to the people it detains.

90.    Defendants Clay and William McConnell knew about or were on notice of the foregoing policies and practices.

91.    Despite this knowledge, Defendants Clay and William McConnell turned a blind eye to, were indifferent, and tacitly encouraged these policies and practices to flourish within LaSalle facilities because doing so allows LaSalle to obtain more business and realize more profits, which enriches both men.

### D. Harris County breached its non-delegable duty to provide people in its custody with adequate medical care.

92.    Although Defendants Harris County and Sheriff Ed Gonzalez sought to privatize the operation of their jail by delegating final policy-making authority to LaSalle, Harris County and Sheriff Gonzalez cannot contract away their constitutional obligations, and they are liable for any unconstitutional corporate customs or policies that resulted in harm to any of their detainees and prisoners confined in the LaSalle jails, including the Olla LCC.

93.    In addition, Harris County and Sheriff Gonzalez were on notice that LaSalle had a policy of providing inadequate medical care, as described in this complaint.

94.    Despite this notice, Harris County contracted with LaSalle to house Harris County detainees.

95.    Indeed since 2015, LaSalle jails that are in Texas have been subject to multiple findings of noncompliance by the Texas Commission on Jail Standards.

96.    By outsourcing the incarceration of people like Mr. Carlson to private jails out of state, Harris County is able to evade oversight by the Texas Commission on Jail Standards.

97.    Harris County adopted and ratified the unconstitutional and negligent policies, practices, and conditions implemented by LaSalle at LaSalle Correctional Center.

98.    It was foreseeable that LaSalle's unconstitutional policies, practices, and conditions would jeopardize the safety of Harris County detainees housed at LaSalle jails.

99.    Harris County continues to pay LaSalle substantial sums to house the County's detainees.

100.    Harris County also partners with CoreCivic, with similar contracts to those with LaSalle.

101.    Like LaSalle, CoreCivic has been subject to numerous complaints of regarding inmate death and treatment at their jails.

102.    Harris County outsources the incarceration of people like Mr. Carlson to private jail facilities in part to save money and avoid oversight.

## CAUSES OF ACTION

### COUNT I - 42 U.S.C. § 1983 *Monell* Liability
### Defendants Harris County, LaSalle, and all individual defendants in their official capacities.

103.    Plaintiffs incorporate all previous paragraphs as if fully restated herein.

104.    An official policy or custom existed pursuant to which LaSalle, Harris County, and the individual defendants in their official capacities (the "*Monell* Defendants") provided inadequate medical care to detainees in the custody of Harris County that are housed in LaSalle facilities, including Olla LCC.

105.    Policymakers for the *Monell* Defendants knew about or were on notice of these policies and customs.

106.    These policymakers were deliberately indifferent to said policies and customs.

107.    The policies and customs were undertaken in wanton disregard for the rights and safety of others, including Mr. Carlson.

108.    These policies and customs were the driving force behind the failure to provide adequate medical care to Mr. Carlson, leading to his suffering and death and caused a violation of Plaintiff's rights.

109.    The *Monell* Defendants are liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law, including 42 U.S.C. § 1983, and state law.

## COUNT II – 42 U.S.C. § 1983 Supervisor Liability
## Defendants Ed Gonzalez, Clay McConnell, William McConnell, John Stuckey, and Pamela Hearn, in their individual capacities.

110.    Plaintiffs incorporate all previous paragraphs as if fully restated herein.

111.    Defendants Ed Gonzalez, Clay McConnell, William McConnell, John Stuckey, and Pamela Hearn, in their individual capacities (the "Supervisor Defendants"), are supervisors of one or more persons who violated Mr. Carlson's rights.

112.    The Supervisor Defendants adopted policies that encouraged or were indifferent to the provision of inadequate medical care within LaSalle facilities, including Olla LCC.

113.    The Supervisor Defendants' foregoing policies caused Mr. Carlson's suffering and death, and the violation of Plaintiffs' rights under federal law and Louisiana law.

114.    The Supervisor Defendants adopted and/or failed to adopt the foregoing policies with deliberate indifference.

115.    Said policies and customs were undertaken in wanton disregard for the rights and safety of others, including Mr. Carlson.

116.    Said policies and customs were the driving force behind the failure to provide adequate medical care to Mr. Carlson, leading to his suffering and death, and caused a violation of Plaintiffs' rights.

117.    The Supervisor Defendants are liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law, including 42 U.S.C. § 1983, and state law.

**COUNT III - 42 U.S.C § 1983**
**Fourteenth Amendment Deliberate Indifference**
**Defendants Charlotte Fussell, Tara Lindsey, Gwen Warren, Paul Smith,**
**Doe Nurses, and Doe Correctional Officers in their individual capacities.**

118.    Plaintiffs incorporate all previous paragraphs as if fully restated herein.

119.    Mr. Carlson was exposed to a substantial risk of serious harm.

120.    The following defendants, in their individual capacities, were deliberately indifferent to that risk: Charlotte Fussell, Tara Lindsey, Gwen Warren, Assistant Warden Paul Smith, Doe Nurses 1-5, and Doe Correctional Officers 1-5.

121.    The deliberate indifference of these defendants harmed Mr. Carlson, causing his suffering and death.

122.    Said indifference was undertaken in wanton disregard for Mr. Carlson's rights.

123.    Said indifference harmed Mr. Carlson, leading to his suffering and death, and caused a violation of Plaintiffs' rights.

124.   These defendants are liable for such damages, punitive damages, and attorney fees, costs, and interest under federal law, including 42 U.S.C. § 1983, and state law.

### COUNT IV – Wrongful Death
### All Defendants

125.   Plaintiffs incorporate all previous paragraphs as if fully restated here.

126.   Mr. Carlson died by the fault of the defendants.

127.   Plaintiffs bring this suit to recover damages which they sustained as a result of Mr. Carlson's death.

128.   As a result of Mr. Carlson's death, his mother, grandmother, and child have lost his love, affection, companionship, services, and support.

129.   As a result of Mr. Carlson's death, his mother, grandmother, and daughter have also experienced pain, suffering, and distress resulting from his death.

130.   Plaintiffs further seek medical and funeral expenses for Mr. Carlson.

### JURY DEMAND

131.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial of all issues capable of being determined by a jury.

### PRAYER FOR RELIEF

132.   WHEREFORE, Plaintiffs pray for judgment against Defendants, actual damages, punitive damages, costs, attorneys' fees, disbursement, interest, and any other and further relief as this Court deems just and equitable.

_/s/ Chris Guillet_

J. Chris Guillet - Attorney at Law, LLC
507 2nd Street
Natchitoches, LA 71457
318-379-4410  Office
318-471-2545   Mobile
chris@guilletlaw.com

_/s/ Ronald E. Corkern, Jr._

Ronald E. Corkern, Jr. - Attorney at Law
616 Front Street
Natchitoches, LA 71457
318-352-2302  Office
318-471-7167   Mobile
rcorkern@ccglawfirm.com


_/s/ Sam Harton_ [with consent]
Sam Harton*
Stephen H. Weil*
Romanucci & Blandin LLC
321 N. Clark Street
Suite 900
Chicago, IL 60654
sharton@rblaw.net
sweil@rblaw.net
312-458-1000
*_pro hac vice_ forthcoming